UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 21-120 (MJD)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL PAUL DAHLAGER,<br><br>Defendant. | GOVERNMENT'S POSITION ON SENTENCING |

_____

"I don't think [my wife] realizes that she married somebody with a propensity for violence." *Defendant – recorded on December 12, 2020.*

"I'd go out fighting….Go hunt some pig." *Defendant – recorded on March 31, 2021.*

_____

The United States of America, through its attorneys, W. Anders Folk, Acting United States Attorney for the District of Minnesota, and Assistant United States Attorney Andrew R. Winter, respectfully submits its Sentencing Position in this case. After consideration of all the facts of this case, as well as the United States Sentencing Guidelines (hereinafter the "U.S.S.G."), and the factors set forth at Title 18, United States Code, § 3553(a), the United States believes that a sentence of 24 months' imprisonment, followed by three (3) years of supervised release, is sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

I.   INTRODUCTION

On July 14, 2021, Defendant Michael Paul Dahlager ("Defendant") pled guilty to Unlawful Possession of a Machine Gun of 18 U.S.C. §§ 922(o). Presentence Report ("PSR"), ¶ 2. The conduct underlying his guilty plea involved the possession of "auto sears" – devices designed to be inserted into a semi-automatic firearm for the purpose of converting the weapon to fully automatic (i.e., a machine gun). An examination of the factors set forth in 18 USC Section 3553(a), to include Defendant's violent, anti-government rhetoric, leads to the conclusion that a sentence of 24 months imprisonment is appropriate.

II.   FACTS OF THE CASE

In November of 2020, Defendant was brought to the attention of the FBI as the result of troubling statements he made to a confidential human source ("CHS") about committing violence against members of law enforcement. ¶ 9. Importantly, these statements were made in the context of his membership in the "Boogaloo Bois" – a loosely-organized, anti-government, pro-gun, extremist movement in the United States. Boogaloo adherents like Defendant are preparing for, or seek to incite, a second American Civil War, which they call the 'Boogaloo.' The Boogaloo movement organizes primarily online and its participants have appeared at in-person events, including the 2020 United States anti-lockdown protests and the protests taking place in the aftermath of the murder of George Floyd. Defendant recently explained his connection to the Boogaloo movement to the probation officer assigned to this case: "I sought approval from a group of guys that made

me feel accepted and important while in truth the boogaloo bois sought division and self-gratification." PSR, ¶ 28.

### A. Defendant's Possession of Auto Sears and a Silencer

On November 21, 2020, Defendant invited the CHS to his home in St. Cloud. There, the CHS observed body armor, an AR-15 assault rifle, a suppressor made from a solvent trap, and two auto-sears. PSR ¶ 8. Weeks later, the CHS joined Defendant when he travelled to St. Paul, Minnesota, for a "Stop the Steal" rally at the State Capitol. PSR ¶ 9. Defendant claimed that he was doing "recon" for the scheduled January 17th protest[1] which Defendant planned to defend. He would later decide against attending the protest at the capitol because the group learned of law enforcement's interest in the Boogaloo Bois. PSR ¶ 13.

During the "recon" trip to the capitol, Defendant made the statement that his wife doesn't realize that she "married someone with a propensity for violence" and that he was "prepared to die for my country…the army is here. The state's standing army that we were warned about is at the Capitol." PSR ¶ 9. When Defendant later reviewed the video he shot during the rally, he pointed out police sniper positions on a building which prompted a fellow Boogaloo Bois present to suggest, "so we blow that building first." To this, Defendant replied, "yup." PSR ¶ 11. Three weeks later, Defendant showed another video to the CHS. In this video, Defendant was recorded firing a rifle both with, and without, a

---

[1] Supporters of Trump held small-scale armed demonstrations at various U.S. state capitols in the days leading up to the inauguration of President Biden, in opposition to the results of the 2020 presidential election. The turnout in Minnesota, however, was small.

3

suppressor affixed to the barrel. PSR ¶ 12. The CHS noted the significant noise-reduction achieved by Defendant's suppressor.

On February 3, 2021, the CHS met Defendant at his home. Defendant retrieved two auto-sears from his basement and gave them to the CHS. He also showed the CHS how the auto sears should be installed in a firearm, indicating that he had successfully installed them in his "APF" but unsuccessfully into his Ruger. The CHS would later turn over the auto sears to FBI agents. PSR ¶ 15. The ATF later examined those two devices and concluded they met the definition of a "machine gun" under federal law.

Defendant would reveal to the CHS that he had purchased 10 auto sears in May of 2020 and that he bought them online from someone he met on Facebook. PSR ¶ 17. He also spoke about mounting marital troubles and his in-laws' distrust of him around his children. *Id*. In March of 2021, Defendant told the CHS that his wife wanted him to remove his weapons from the home. As part of this conversation, he stated that if he wanted to commit "suicide by cop, I'm not going to wear a bulletproof vest…or carry 30 magazines for a gun I don't have…I'd go out fighting…go hunt some pig." PSR ¶ 18. Concerned that Defendant was becoming an imminent threat to himself and others, FBI agents took him into custody at his place of employment on April 7, 2021. PSR ¶ 19. At the time of his arrest, a significant quantity of evidence was recovered from his vehicle and home.

### B. Evidence Recovered Post-Arrest

Consistent with his obsession with firearms and his Boogaloo Bois rhetoric, agents found an arsenal in the trunk of Defendant's car: a tactical vest with ballistic plates, eight (8) loaded .556 rifle magazines, three (3) loaded .40 magazines, a silencer case, four (4)

smoke grenades, flex cuffs, zip ties, a radio headset, a copy of the Declaration of Independence, Boogaloo Bois paraphernalia, a tactical belt with knife, 6 more auto-sears, a .40 pistol, a .556 Ruger AR rifle, and a bolt-action rifle.  The following photographs depict just some of these items:







Defendant's wife was interviewed at the time the house was searched. PSR ¶ 21. She revealed that Defendant has been involved in the Boogaloo Bois for one to two years despite his denying his association with the extremist group. She was troubled by statements he made reflecting his dislike of law enforcement and she recalled that he had even flown a Boogaloo Bois flag outside their home. Further, despite being five months

6

behind on their mortgage, Defendant had used their money to buy firearms and tactical gear.[2]

**Defendant's Interview with Agents**

Defendant provided a post-Miranda statement to agents on the day of his arrest. PSR ¶ 23. During the interview, Defendant admitted purchasing ten (10) auto sears and an oil cannister intended to act as a firearm suppressor. He admitted that his family warned him against possessing the auto sears and that he knew their illegal purpose.

### III.   THE GUIDELINES ANALYSIS

The United States agrees with the guidelines analysis contained in the PSR. The base offense level is 18 (PSR ¶ 30) and, to date, Defendant has earned a 3-level reduction for acceptance of responsibility. PSR ¶ 38. Defendant's criminal history Category is I (PSR ¶ 48), resulting in an advisory guidelines range of 18-24 months imprisonment (PSR ¶ 77), with one to three years of supervised release. PSR, ¶¶ 80-81.

### IV.   ARGUMENT

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence.  552 U.S. at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure

---

[2] Defendant's wife made him return one firearm for which she had found a receipt.

7

is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.").

Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### A. Nature and Circumstances of the Offense

Defendant's conduct is in this case is extraordinarily troubling. His possession of devices capable of converting his readily accessible firearms to full auto, combined with his extremist ideology and apparent mental health struggles paints a potentially deadly picture. Furthermore, sharing the source of supply for auto-sears with another (supposed) like-minded individual demonstrates Defendant's willingness to place these devices in the hands of other Boogaloo Bois with violent anti-government views. His words, his obsessions, his association with the Boogaloo movement, and his possession of lethal and illegal machine guns illuminate the danger presented by Defendant.

### B. History and Characteristics of the Defendant

The history and characteristics of Defendant documented in the PSR do little to shed light on his criminal conduct. Defendant was homeschooled and continues to maintain ties with his family. PSR ¶ 52. Defendant has encountered physical and mental health issues that appear to have impacted his adjustment to adulthood. PSR ¶¶ 59-63. His contacts with law enforcement have thus far been limited to speeding tickets. PSR ¶¶ 45-48.

### C. Promoting Respect for the Law and Providing Just Punishment for the Offense

Defendant stands before the court convicted of the possession of a machine gun. The seriousness of this offense can only be properly reflected by a sentence at the high-end of the guidelines range. The core of his conduct is a deep, abiding disrespect for the law and law enforcement, and therefore fashioning a sentence that promotes respect for the law is a particularly important for Defendant. Further, a sentence of 24 months is needed to promote respect for the law, not just for Defendant, but for others who would support him and his armed anarchist cause.

### D. Deterrence and Protecting the Public

Fanaticism is difficult to deter but the effort must be made. The recommended sentence in this case is needed for both individual and general deterrence, and to furthermore protect the public from Defendant's dangerous ideology and behavior. Individual deterrence discourages a defendant from committing such a crime in the future. Whether Defendant is deterred will depend, in part, on whether he can successfully loosen his grip on radical thought and action.

General deterrence is necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States,* 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis,* 451 F.3d 918, 920 (8th Cir. 2006)). General deterrence is necessary to impress upon the greater community that no matter the circumstances, aiding a designated terrorist organization –

9

no matter what the purpose – has dire consequences. A substantial sentence is necessary to deter individuals from supporting international terrorism in any form or under any circumstances.

The need for a sentence that protects the public is plainly evidenced by Defendant's conduct and his words in this case. The danger presented to the community by the combination of fully automatic weapons, a violent extremist ideology, and his general instability is significant and evidences the need for a sentence at the top of the advisory guidelines range.

### E. The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment

The government will support Defendant receiving any programming offered by the Bureau of Prisons that will reduce the risk he represents to the public when he is released from prison. Defendant's own psychological assessment[3] supports the notion that mental health treatment is absolutely appropriate in this case. The sentence recommended by the government will allow sufficient time for professionals to work towards stabilizing Defendant's extremist views and promoting law-abiding conduct in the future.

### C. The need to avoid unwarranted sentencing disparities

The recommended sentence would not create an unwarranted disparity. Unlike other cases involving possession of illegal firearms, this case is not limited to a single or momentary possession of an auto sear. Rather, it involves Defendant's possession of

---

[3] *See* Report of Dr. Ernest Boswell, dated September 21, 2021.

multiple devices over the course of months, his distribution of those devices, and his stated intent to use his weapons against law enforcement.

## CONCLUSION

For all these reasons, the United States respectfully asks this Court to sentence Defendant Michael Paul Dahlager to a term of imprisonment of 24 months, followed by three years of supervised release.

Dated: November 5, 2021         Respectfully submitted,

W. ANDERS FOLK
Acting United States Attorney

*s/ Andrew R. Winter*

BY: ANDREW R. WINTER
Assistant United States Attorney
Attorney ID No. 232531